UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

(Newport News Division)

| | |
|---|---|
| AMALGAMATED BANK, as Trustee for the ) <br> LONGVIEW 600 SMALL CAP INDEX ) <br> FUND, Derivatively on Behalf of LUMBER ) <br> LIQUIDATORS HOLDINGS, INC., ) <br> ) <br>         Plaintiff, ) <br> ) <br>   vs. ) <br> ) <br> MACON F. BROCK, JR., ROBERT M. ) <br> LYNCH, DOUGLAS T. MOORE, JOHN M. ) <br> PRESLEY, PETER B. ROBINSON, MARTIN ) <br> F. ROPER, THOMAS D. SULLIVAN, ) <br> JIMMIE L. WADE, NANCY M. TAYLOR, ) <br> DANIEL E. TERRELL, CARL R. DANIELS, ) <br> JEFFREY W. GRIFFITHS and WILLIAM K. ) <br> SCHLEGEL, ) <br> ) <br>         Defendants, ) <br> ) <br>   – and – ) <br> ) <br> LUMBER LIQUIDATORS HOLDINGS, ) <br> INC., a Delaware corporation, ) <br> ) <br>         Nominal Defendant. ) <br> ) | Civil Action No. 4:15cv 30 <br><br> <u>DEMAND FOR JURY TRIAL</u> |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY OF LOYALTY, CORPORATE WASTE AND
UNJUST ENRICHMENT**

### OVERVIEW OF THE ACTION

1.    This is a shareholder derivative action on behalf of nominal defendant Lumber

Liquidators Holdings, Inc. ("Lumber Liquidators" or the "Company") against its Board of Directors

(the "Board") and certain of its current and former top officers for breach of fiduciary duty, abuse of

control, corporate waste and unjust enrichment.  Defendants include Macon F. Brock, Jr., Robert M. Lynch, Douglas T. Moore, John M. Presley, Peter B. Robinson, Martin F. Roper, Thomas D. Sullivan Jimmie L. Wade and Nancy M. Taylor (together, the "Lumber Liquidators Board Members"); Lumber Liquidators' Chief Financial Officer ("CFO"); Daniel E. Terrell, Senior Vice President, Supply Chain, Carl R. Daniels, Chief Merchandising Officer, William K. Schlegel, and former Chief Executive Officer ("CEO"), Jeffrey W. Griffiths (the Lumber Liquidators Board Members, Terrell, Daniels, Schlegel and Griffiths are referred to collectively as the "defendants").

2.      Lumber Liquidators is a multi-channel specialty retailer of hardwood flooring and hardwood flooring enhancements and accessories.  The Company purports to offer an extensive assortment of exotic and domestic hardwood species, engineered hardwoods and laminates direct to the consumer.  The Company also features renewable flooring products, bamboo and cork, and provides a wide selection of flooring enhancements and accessories, including moldings, noise-reducing underlay, adhesives and flooring tools.

3.      Lumber Liquidators sources its wood flooring products directly from mills, many of which are located in China, allowing the Company to avoid the need for middlemen or distributors. As a result of this business strategy, which fostered direct contact and supervision between the Company and the mills from which its products were obtained, the defendants named herein were acutely aware, or were recklessly unaware, of where the mills obtained the wood used to create Lumber Liquidators' products as well as the process employed by the mills to create those products.

4.      From at least 2007 through 2011, Lumber Liquidators and its top competitors, The Home Depot Inc. and Lowe's Companies Inc., each reported gross margins for similar wood flooring products of roughly 34% to 35% per year.  However, while Home Depot's and Lowe's gross margins generally remained in this narrow range, in 2012 Lumber Liquidators' gross margins began dramatically increasing, reaching 41.8% by the third quarter of 2013.  Defendants knew, or were

reckless in not knowing, that these dramatic and sudden above-market profit margins could not have been attained without purchasing illegally sourced or non-compliant wood.

5.      Beginning at least as early as 2011, defendants caused the Company to engage in the purchase and sale of illegally sourced lumber from protected Russian forests in violation of the Lacey Act (16 U.S.C. §§3371-3378) and to purchase and sell Chinese-made laminate flooring products containing toxic levels of formaldehyde in violation of the California Air Resources Board's Regulations ("CARB Regulations") (17 C.C.R. §§93120-93120.12) and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Cal. Health and Safety Code §25249.5, *et. seq.*) ("Proposition 65"), and in excess of the federal guidelines set forth in the Formaldehyde Standards for Composite Wood Products Act (the "FSCWP Act"), signed into law on July 7, 2010 (15 U.S.C. §§2601, 2697). Defendants then caused Lumber Liquidators to falsely label these products as CARB Phase-2 compliant.

6.      The CARB Regulations, which have been in effect since January 1, 2009, establish limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard and particleboard. CARB Regulations dictate that all HWPW (Hardwood Plywood) products sold in the state of California should emit no more than 0.05 parts per million ("ppm") of formaldehyde. The national emission standards in the Environmental Protection Agency's ("EPA") proposed rules implementing the FSCWP Act standards mirror the previously established CARB Regulations. *See* 40 C.F.R. Part 770; 78 F.R. 34820, 44089, 51695, and 79 F.R. 19305.

7.      The Lacey Act is a conservation statute that was signed into law on May 25, 1900. The Lacey Act is designed to protect plants and wildlife by imposing civil and criminal penalties for a wide array of violations prohibiting trade in wildlife, fish and plants that have been illegally taken, transported or sold. The Lacey Act was amended in 2008 to add provisions banning the import and

trade of illegally sourced wood products (including wood products sourced in violation of foreign laws)[1] and imposing civil and criminal penalties on violators. Among other things, the Lacey Act requires that importers evaluate their own supply chains and take reasonable and prudent measures to exclude illegally cut wood. The Lacey Act also requires importers to provide a basic declaration to accompany every shipment of timber or wood product into the United States, including the country of harvest, species, value and quantity of each shipment. The provisions of the Lacey Act are primarily enforced by the U.S. Department of Agriculture ("DOA") and the U.S. Fish and Wildlife Service ("FWS") with support from the Department of Homeland Security ("DHS") and the Department of Justice ("DOJ").

8.     As corporate directors and officers, defendants owe Lumber Liquidators fiduciary duties – the highest duties known to the law. These duties include a fiduciary duty of loyalty (and its subsidiary duties of candor and good faith), in the management and administration of the Company's affairs, as well as in the use and preservation of Lumber Liquidators' property and assets. Delaware law holds: "The affairs of Delaware corporations are managed by their board of directors, who owe to shareholders duties of *unremitting* loyalty. This means that their actions must be taken in the good faith belief that they are in the best interests of the corporation and its stockholders, especially where conflicts with the individual interests of directors are concerned. . . . When those same directors communicate with shareholders, they also must do so with *complete candor*. Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic

---

[1]     Russian law regulates the harvesting of wood in excess of stated permits and outside designated areas. As a result, importing such wood to the United States is a violation of the Lacey Act.

candor." *In re Tyson Foods, Inc., Consolidated Shareholder Litigation*, No. 1106-CC, 2007 Del. Ch. LEXIS 120, at *10-*11 (Del. Ch. Aug. 15, 2007) (emphasis in original, footnotes omitted).

9.     Defendants breached their fiduciary duty of loyalty by failing to adopt and maintain the internal controls and policies to govern the importation, manufacture, sale and distribution of the Company's Chinese wood flooring materials. Such controls were necessary to ensure Lumber Liquidators' compliance with the applicable formaldehyde standards, including CARB Regulations and the FSCWP Act and Lacey Act.

10.     In relation to the aforementioned Lacey Act and CARB Regulations, Lumber Liquidators' directors and officers had a known duty to act, *i.e.*, to implement and maintain internal controls and policies to prevent violations of these laws. Nevertheless, defendants consciously failed to act, *i.e.*, did not implement and maintain such controls and policies at the Company. As a result, Lumber Liquidators imported, manufactured, sold and distributed Chinese Flooring that emits excessive levels of formaldehyde, which is categorized as a known carcinogen by the United States National Toxicology Program and the International Agency for Research on Cancer, in direct violation of the CARB Regulations. Defendants additionally allowed the Company to import, manufacture, sell and distribute wood flooring that is illegally sourced through China and other countries (including Russia), threatening critical habitat and endangered species, in violation of the Lacey Act. Both actions were in direct contrast to repeated representations by the Company to the contrary.

11.     Had the Lumber Liquidators Board Members implemented and maintained the appropriate controls and policies, as their fiduciary duty of loyalty required, these violations of environmental and consumer protection laws most likely would not have occurred. The Lumber Liquidators Board Member's conscious failure to act, when faced with a known duty to act, breached their fiduciary duty of loyalty (and good faith) owed to Lumber Liquidators by each and every Board

Member.  As a result, each Lumber Liquidators Board Member is personally liable to Lumber Liquidators for the damages resulting from their misconduct.

12.     The Lumber Liquidators Board Members also breached their fiduciary duties of loyalty (and candor) by making false and misleading statements to Lumber Liquidators shareholders in the Company's shareholder reports.  For example, Lumber Liquidators' Annual Reports on SEC Form 10-K for 2011, 2012, 2013 and 2014 artificially inflated Lumber Liquidators' publicly reported financial results because they failed to disclose that the Company was selling illegally sourced and toxic products to its customers in violation of rules and regulations designed to protect the environment and consumers.

13.     Defendants' fiduciary failures have already caused significant harm to the Company. For example, on September 26, 2013, federal law enforcement officials from the United States Department of Immigration and Customs Enforcement's Homeland Securities Investigations unit, together with agents from the DOJ and FWS, raided the Company's corporate offices in Toano and Richmond, Virginia.  These federal agents were seeking information related to the Company's importation of illegal wood products from protected forests in the Russian Far East ("RFE") in violation of the Lacey Act.

14.     Moreover, as a result of defendants' breaches of their fiduciary duties, the Company is now subject to several complex and expensive securities class action lawsuits alleging violations of the CARB Regulations; the Lacey Act; the Racketeer Influenced & Corrupt Organizations Act ("RICO"); the Magnuson-Moss Warranty Act; breach of express and implied warranties; violation of Consumer Protection/Deceptive Practices acts; unjust enrichment; and lawsuits alleging violations of California's Proposition 65.  On March 10, 2015, *The New York Times* reported that the Attorney General of New York, Eric T. Schneiderman, had opened an inquiry into whether the Company violated safety standards and that officials in California are also likely to investigate.

15.     Defendants' fiduciary failures have also exposed the Company to criminal charges. On February 25, 2015, the Company announced in its Form 10-K for the fiscal year ended December 31, 2014, that "[i]n recent communications, the DOJ indicated that it is contemplating seeking criminal charges under the Lacey Act. . . . At this time, the Company does not have enough information to estimate a reasonably possible loss or range of loss that may result from actions by the DOJ as a result of its investigation."

16.     On March 1, 2015, *60 Minutes*, an American newsmagazine television program broadcast on the CBS television network, aired a show revealing that the Company was selling laminated flooring made in China that failed to meet California and federal health and safety standards because it contained high levels of formaldehyde. The program indicated that the average level of formaldehyde in Lumber Liquidators' products was six to seven times above the State of California's permissible emission limitations, and that some samples were close to 20 times above the level that is allowed to be sold. *60 Minutes* hired investigators who posed as buyers to visit three of the Company's factories in China. All three admitted they were labeling Lumber Liquidators' product as CARB Phase 2 compliant, *i.e.,* compliant with California's formaldehyde emissions regulations when they knew the product was non-compliant. *See* http://www.cbsnews.com/news/lumber-liquidators-linked-to-health-and-safety-violations/.

17.     Although Lumber Liquidators has been severely injured, defendants have not fared nearly so badly. During the relevant time period, defendants collectively pocketed millions in salaries, fees, stock options, illicit insider trading profits and other payments that were not justified in light of the violations of state and federal law at Lumber Liquidators that occurred on their watch. These payments wasted valuable corporate assets and unjustly enriched defendants.

18.     Notwithstanding the enormous damage to Lumber Liquidators arising from the violations of federal law, the Company's Board has not and will not commence suit against

defendants for breach of loyalty, corporate waste and/or unjust enrichment, let alone vigorously prosecute such claims. By this action, plaintiff seeks to vindicate Lumber Liquidators' rights against its wayward fiduciaries.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(1), because plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     This Court has personal jurisdiction over each defendant named herein because each defendant is a corporation that conducts business in and maintains its principal place of business within this District, an individual who is a citizen of the Commonwealth of Virginia resident in this District, or an individual who is a citizen of another state and is subject to jurisdiction in the Commonwealth pursuant to the Virginia "long arm" jurisdictional statute, Va. Code Ann. §8.01-328.1, and has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.[2]

21.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(a) because: (i) Lumber Liquidators maintains its executive offices and principal place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a

---

[2]   In particular, each of the individual defendants in this action is either (a) a citizen of the Commonwealth of Virginia resident in this District, or (b) a citizen of another state who has subjected himself or herself to jurisdiction in this Commonwealth by transacting business in this Commonwealth, Va. Code Ann. §8.01-328.1 A 1, contracting to supply services in this Commonwealth, *id*. §8.01-328.1 A 2, causing tortious injury by acts or omissions in this Commonwealth, *id*. §8.01-328.1 A 3, and/or causing tortious injury in this Commonwealth by acts or omissions outside this Commonwealth and regularly doing or soliciting business, or engaging in any other persistent course of conduct, or deriving substantial revenue from services rendered, in this Commonwealth, *id*. §8.01-328.1 A 4.

substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lumber Liquidators, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District. Venue is proper in this division of the Court pursuant to Local Civil Rule 3(C) because: (i) Lumber Liquidators maintains its executive offices and principal place of business in this division; (ii) one or more of the defendants either resides in or maintains offices in this division; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lumber Liquidators, occurred in this division; and (iv) defendants have received substantial compensation in this division by doing business here and engaging in numerous activities that had an effect in this division.

## THE PARTIES

22.     Plaintiff Amalgamated Bank, as Trustee for the LongView 600 Small Cap Index Fund, is a Lumber Liquidators shareholder and has been continuously since 2009. Plaintiff is a citizen of the State of New York.

23.     Nominal party Lumber Liquidators is a Delaware corporation with its executive offices located in James City County, Virginia, more particularly at 3000 John Deere Road, Toano, Virginia, 23168. Lumber Liquidators is the largest specialty retailer of hardwood flooring in North America. Lumber Liquidators is a citizen of the Commonwealth of Virginia and the State of Delaware.

24.     Defendant Robert M. Lynch has been a Lumber Liquidators director since January 2012. He has also served as the Company's President and Chief Executive Offier ("CEO") since

- 9 -

January 2012. Lynch previously served as the Company's President and Chief Operating Officer from January 2011 to January 2012. Between September 2011 and March 1, 2015, Lynch sold approximately 227,278 shares of his Lumber Liquidators' stock – over 70% of his holdings – for a total insider trading profit of over $21 million. Lynch signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Lynch is a citizen of the State of Texas.

25.     Defendant Thomas D. Sullivan, Lumber Liquidators' founder, has been the Chairman of the Board of Lumber Liquidators since the Company's inception in 1994. He also currently advises and supports the Company's marketing and advertising departments and is active in its sourcing initiatives. Sullivan previously served as President and CEO of the Company from 1994 to September 2006. Sullivan signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Between September 2011 and March 1, 2015, Sullivan sold approximately 1,608,503 shares of his Lumber Liquidators' stock – over 72% of his holdings – for a total insider trading profit of over $60 million. Sullivan is a citizen of the State of Florida.

26.     Defendant Macon F. Brock, Jr. has been a Lumber Liquidators director since November 2007. Brock signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Brock is a citizen of the Commonwealth of Virginia.

27.     Defendant Douglas T. Moore has been a Lumber Liquidators director since April 2006. Moore is also a member of the Audit Committee of the Lumber Liquidators Board. Moore signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Between September 2011 and March 1, 2015, Moore sold approximately 37,612 shares of his Lumber Liquidators' stock – over 84% of his holdings – for a total insider trading profit of over $2.4 million. Moore is a citizen of the Commonwealth of Virginia.

28.     Defendant John M. Presley has been a Lumber Liquidators director since April 2006. Presley is also the Chair of the Audit Committee of the Lumber Liquidators Board. Presley signed

the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Between September 2011 and March 1, 2015, Presley sold approximately 37,044 shares of his Lumber Liquidators' stock – over 61% of his holdings – for a total insider trading profit of over $3.8 million. Presley is a citizen of the Commonwealth of Virginia.

29.     Defendant Peter B. Robinson has been a Lumber Liquidators director since April 2010. Robinson signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Robinson is a citizen of the State of Colorado.

30.     Defendant Martin F. Roper has been a Lumber Liquidators director since April 2006. Roper is also a member of the Audit Committee of the Lumber Liquidators Board. Roper signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Roper is a citizen of the Commonwealth of Massachusetts.

31.     Defendant Jimmie L. Wade has been a Lumber Liquidators director since September 2011. Wade is also a member of the Audit Committee of the Lumber Liquidators Board. Wade signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Wade is a citizen of the Commonwealth of Virginia.

32.     Defendant Nancy M. Taylor has been a Lumber Liquidators director since April 2014. Taylor signed the Company's 2014 Form 10-K. Taylor is a citizen of the Commonwealth of Virginia.

33.     Defendant Daniel E. Terrell has been Lumber Liquidators' CFO since October 2006. Terrell signed the Company's 2011, 2012, 2013 and 2014 Forms 10-K. Between September 2011 and March 1, 2015, Terrell sold approximately 138,491 shares of his Lumber Liquidators' stock – over 63% of his holdings – for a total insider trading profit of over $8.8 million. Terrell is a citizen of the Commonwealth of Virginia.

34.     Defendant Carl R. Daniels has been Lumber Liquidators' Senior Vice President, Supply Chain, since October 2011. Daniels is a citizen of the Commonwealth of Virginia.

35.     Defendant Jeffrey W. Griffiths served as the Company's CEO from September 2006 to January 1, 2012 and its President from September 2006 to January 2011. Griffiths is a citizen of the Commonwealth of Pennsylvania.

36.     Defendant William K. Schlegel has served as the Company's Chief Merchandising Officer since March 2011. Schlegel is a citizen of the State of South Carolina.

## THE FIDUCIARY DUTIES OF LUMBER LIQUIDATORS' DIRECTORS AND OFFICERS

37.     As directors and officers of Lumber Liquidators, defendants owed Lumber Liquidators and its shareholders unremitting fiduciary duties of loyalty and good faith, and were and are required to use their utmost ability to control and manage Lumber Liquidators in a fair, just, honest and equitable manner. Defendants were duty bound to act in furtherance of the best interests of Lumber Liquidators and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. A claim for breach of loyalty is non-exculpable.

38.     Defendants owed Lumber Liquidators a fiduciary duty to conduct the affairs of the Company in a lawful manner and in compliance with state and federal laws and other rules and regulations designed to protect the environment and consumers, including the CARB Regulations and the Lacey Act. This is because compliance with the statutes, laws, rules and regulations applicable to Lumber Liquidators' business and affairs is not optional for the Lumber Liquidators Board.

39.     Moreover, as directors and/or officers of a public company, defendants had a fiduciary duty of candor and loyalty pursuant to which they were required to promptly disseminate accurate and truthful information to the SEC and Lumber Liquidators' shareholders regarding the Company's business, prospects and operations. Because of their executive positions and/or access to

Lumber Liquidators' internal information, defendants knew or should have known that adverse material facts were being concealed from the investing public, and that such non-disclosure was materially misleading, particularly in light of the false and misleading statements that defendants caused the Company to make. Such concealment and failures to disclose, together with the material misrepresentations and false public statements on the part of defendants, caused Lumber Liquidators common stock to trade at artificially inflated prices.

40. To discharge their fiduciary duties of candor, good faith and loyalty, the directors and officers of Lumber Liquidators were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Lumber Liquidators were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Lumber Liquidators conducted its operations, and upon receipt of notice or information of imprudent or unsound conditions and practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with securities laws; and

(d) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

41. By reason of their corporate positions and their ability to control the business and corporate affairs of Lumber Liquidators, defendants were required to use their ability to control Lumber Liquidators in a fair, just and equitable manner, as well as to act in furtherance of the best interests of Lumber Liquidators and not in furtherance of their own personal interests or ideology. In violation of their fiduciary duties of candor, loyalty and good faith, defendants caused Lumber Liquidators to conduct its business in an unsafe, imprudent, dangerous and illegal manner.

42. Defendants participated in the wrongdoing complained of herein in order to improperly benefit themselves, instead of acting in the best interests of the Company, and to remain as directors and officers of a public corporation and to continue to prolong the illusion of Lumber Liquidators' success and to conceal the adverse facts concerning Lumber Liquidators' legal compliance status so that they could protect and perpetuate their directorial and/or executive positions and increase the substantial compensation, perks and prestige they obtained thereby. Such participation involved, among other things, planning and creating (or causing to be planned and created), proposing (or causing the proposal of) and authorizing, and approving and/or acquiescing in the illegal conduct complained of herein.

43. During all times relevant hereto, each of the defendants occupied a position with Lumber Liquidators or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning Lumber Liquidators and its operations, finances and financial condition. Because of these positions and such access, each of the defendants knew that the true facts specified herein regarding Lumber Liquidators' business and finances had not been disclosed to, and were being concealed from, its shareholders and the public. Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding the Company and to take any and all actions necessary to ensure that

the officers and directors of Lumber Liquidators did not act upon such privileged non-public information in a manner which caused the Company to violate the law.

44. Defendants breached their duties of candor, loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results, legal compliance status, and prospects, as detailed herein, and by failing to prevent defendants from taking such illegal actions. Each of the defendants participated in the issuance and/or review of false and misleading statements, including the preparation of false and misleading press releases, Securities and Exchange Commission ("SEC") filings and reports to Lumber Liquidators' shareholders. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now exposed to millions of dollars in potential liability from lawsuits alleging violations of securities laws, consumer protection and environmental laws, and criminal charges contemplated by the DOJ.

45. Pursuant to Lumber Liquidators' Code of Business Conduct and Ethics ("CBCE"), the Company expects its directors to "comply with all applicable laws, rules and regulations wherever we do business" and to "adhere to the following principles and responsibilities:"

- Act at all times in accordance with Lumber Liquidators's Code of Business Conduct and Ethics . . . ;

- Act at all times with integrity, avoiding actual or apparent conflicts of interest in personal and professional relationships;

  * * *

- Provide, in Lumber Liquidators's reports filed with the Securities and Exchange Commission and other public communications, disclosure that is full, fair, accurate, complete, objective, timely and understandable;

- Comply with rules and regulations of all U.S. and non-U.S. governmental entities and other . . . regulatory agencies to which Lumber Liquidators is subject . . . ;

- Act in good faith, responsibly, with due care, competence and diligence, and without misrepresenting material facts or circumstances;

  * * *

- 15 -

- Promote ethical behavior among employees under [their] supervision;

- Accept accountability for adherence to this Code of Ethics and Lumber Liquidators's Code of Business Conduct and Ethics; and

- Achieve responsible use of and control over all assets and resources of Lumber Liquidators entrusted to [them].

The CBCE also states:

If you suspect or know someone is violating any law, rule or regulation . . . you should immediately report that violation to your immediate supervisor or the Legal department.

\*  \*  \*

- You must not use false data or manipulate information in a manner to suggest that our products or services have characteristics or comply with specification when you know that they do not.

\*  \*  \*

Lumber Liquidators is committed to being a positive force in communities in which it and its suppliers operate, and supports addressing environmental . . . and health and safety issues that may arise in connection with its operations. We believe that implementing high standards for the environment . . . leads to higher-quality products and reduced costs both for us and our customers. To achieve these objectives, Lumber Liquidators has formalized its expectations regarding supplier environmental . . . and health and safety policies in a "Supplier Code of Conduct with Respect to Environmental and Social Responsibility," which includes a "Supply Chain Environmental and Social Responsibility Policy."

\*  \*  \*

Lumber Liquidators Holdings, Inc. is a publicly traded company . . . . As a result, we are obligated to make various public disclosures. Lumber Liquidators is committed to full compliance with all relevant disclosure requirements, and has implemented disclosure controls and procedures to assure that its public disclosures will be timely, compliant and otherwise full, fair, accurate and understandable. Those who are responsible for preparing the Lumber Liquidators' public disclosures, or who provide information as part of that process, are responsible for ensuring that such disclosures are complete, accurate and comply with those disclosure controls and procedures.

46. Lumber Liquidators' Corporate Governance Guidelines ("CGG") set forth additional responsibilities of the Company's directors. Lumber Liquidators' CGG states the following, in relevant part:

I.      Responsibilities of the Board of Directors

. . . The Board of Directors' primary function is . . .oversight – defining and enforcing standards of accountability that enable executive management to execute their responsibilities fully and in the interests of shareholders.  Consistent with that function, the following are the primary responsibilities of the Board of Directors:

*       *       *

- Reviewing the Company's strategic plans and objectives, including the principal risk exposures of the Company and the Subsidiaries;

- Providing advice and counsel to the Chief Executive Officer and other executive management of the Company;

- Assisting management in the oversight of the Company's compliance with applicable laws and regulations, including in connection with its public reporting obligations; [and]

- Overseeing management with a goal of ensuring that the Company's assets are safeguarded through the maintenance of appropriate accounting, financial and other controls;

*       *       *

In discharging their responsibilities, Directors must exercise their business judgment to act in a manner that they believe in good faith is in the best interests of the Company and its shareholders. . . . Directors are also expected to spend the time necessary to discharge their responsibilities appropriately . . . . An alignment of Director interests with those of shareholders is important, and as such Directors are encouraged to own securities of the Company.

47.     Additionally, the members of the Audit Committee, defendants Presley, Moore, Roper and Wade, were required to comply with the obligations set forth in the Charter of the Audit Committee (the "Charter").  According to the Charter, "[t]he purpose of the Committee is to assist the Board in fulfilling its oversight responsibility relating to: . . . (v) the compliance by the Company with legal and regulatory requirements; (vi) the implementation and effectiveness of the Company's disclosure controls and procedures and internal control over financial reporting; [and] (vii) the evaluation of enterprise risk issues."

## AIDING AND ABETTING AND CONCERTED ACTION

48.     In committing the wrongful acts set forth herein, defendants have pursued or joined in the pursuit of a common course of conduct and have acted in concert with one another in furtherance of their common plan or design.   In addition to the wrongful conduct detailed in this complaint giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their respective duties.

49.     Each of the defendants aided and abetted and rendered substantial assistance in the wrongs set forth in this complaint.   In taking such actions to substantially assist the commission of the wrongdoing, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

50.     Based in Toano, Virginia, Lumber Liquidators is the largest retailer of hardwood flooring in the United States.   Lumber Liquidators offers an extensive assortment of exotic and domestic hardwood species, engineered hardwoods, laminates, bamboo and cork at low prices designed to appeal to a diverse customer base.

51.     Lumber Liquidators has mills in, and buys many of its wood flooring materials directly from mills in, China.   In September 2011, Lumber Liquidators acquired the assets of Shanghai-based Sequoia Floorings, Inc. ("Sequoia") related to quality control and assurance, product development, and logistics operations in China.   In connection with the transaction, Lumber Liquidators established a representative office in Shanghai, China and assumed "direct control" of all of its product sourcing in China (through its headquarters in China).   As the Company made clear in its 2014 Annual Report filed with the SEC on Form 10-K:

> Sourcing directly from the mill and our unique store model provides the foundation for our value proposition, which we market aggressively to the homeowner, or a contractor on behalf of a homeowner.

52.     Due to its status as a U.S. company, Lumber Liquidators is subject to federal and state laws, including the FSCWP Act, CARB Regulations, California's Proposition 65 and the Lacey Act. This action arises out of defendants' failure to establish and maintain internal controls sufficient to prevent the Company from engaging in an ongoing scheme to import into the United States and to falsely warrant, advertise and sell Chinese flooring that fails to comply with the FSCWP Act, CARB Regulations, Proposition 65 and the Lacey Act.

## LUMBER LIQUIDATORS' VIOLATIONS OF FEDERAL LAW
## AND OTHER RULES AND REGULATIONS

### Formaldehyde Emissions

53.     According to the EPA, formaldehyde is a "colorless, pungent-smelling gas" that has been shown to cause cancer in humans along with a host of other potential health issues, including eye, nose and throat irritation, wheezing and coughing, fatigue, severe allergic reactions and more. The International Agency for Research on Cancer classified formaldehyde as "carcinogenic to humans" in 2004, based on the increased risk of nasopharyngeal cancer. Formaldehyde was also designated as a toxic air contaminant in California in 1992 with no safe level of exposure.

54.     Formaldehyde is a component in the production of pressed wood products. One of the major sources of exposure to formaldehyde is from inhalation of formaldehyde emissions from composite wood products containing urea-formaldehyde resins. Because of that, the federal and state governments impose limits on the amount of formaldehyde that can be present in wood products.

55.     The California Air Resources Board ("CARB") is a department of the California EPA. CARB's mission is to promote and protect public health, welfare, and ecological resources through effective reduction of air pollutants while recognizing and considering effects on the economy. CARB oversees all air pollution control efforts in California to attain and maintain health-based air quality standards. CARB mandates are typically the model for national standards. For

example, the EPA and the Department of Transportation coordinated their most recent round of proposed rules with CARB. CARB has served as the model for the federal standard in formaldehyde emissions as well.

56.     CARB promulgated the CARB Regulations in January 2009. The CARB Regulations apply to a range of composite wood products, including flooring, hardwood plywood, particleboard and fiberboard. The CARB Regulations (Phase 2) dictate that certain wood products sold in the State of California must emit no more than 0.05 part per million ("ppm") of formaldehyde as determined per relevant testing methods. Violations of CARB Regulations may result in severe penalties assessed against the offending parties. CARB also established a third-party certification framework designed to ensure that manufacturers of composite wood products meet the CARB formaldehyde emission standards by having their composite wood products certified through an accredited third-party certifier. Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

57.     The U.S. statute that governs permissible formaldehyde emissions, the FSCWP Act, was signed into law on July 7, 2010. The FSCWP Act adopted the standards established by CARB as a nationwide standard. In May 2013, upon being directed by Congress to promulgate final regulations implementing the FSCWP Act, the EPA published two proposed rules which are very similar to California's CARB Regulations. *See* 40 C.F.R. Part 770; 78 F.R. 34820, 44089, 51695, and 79 F.R. 19305. The EPA's proposed rules are slated to take effect later this year.

58.     Many, if not all, of Lumber Liquidators' Chinese flooring products contain urea-formaldehyde ("UF") or other formaldehyde resins. For example, the Material Safety Data Sheet for Lumber Liquidators' Morning Star Bamboo Flooring states: "This product is composed of bamboo fibers bonded together with urea formaldehyde (UF) resins." UF makes up 10%-11% of the product.

59.     On June 20, 2013, an article published on *SeekingAlpha.com* alleged, among other things, that testing of one of Lumber Liquidators' branded wood flooring products (imported from China and sold in California) at two accredited independent laboratories found that formaldehyde emissions from the tested product were over 3.5 times the maximum legal limit (0.17 ppm as compared to the legal limit of 0.05 ppm imposed by the CARB standards for hardwood plywood) even though the product was labeled as being CARB-compliant.  The article explained that the investigation into the quality of the Company's wood sourced from China came about as a result of the Company's explanation for how it has been able to continually produce record gross margins.[3]

60.     This disclosure was in direct contrast to Lumber Liquidators' repeated, detailed representations in its SEC filings, on its product labels, website, and elsewhere that its flooring complies with strict formaldehyde standards.

61.     On this news, the price of Lumber Liquidators shares declined, over the course of two trading sessions, $9.40 per share, or nearly 11%, to close at $76.63 per share on June 21, 2013.  This precipitous fall wiped out over $250 million in shareholders' equity.  The Company is also defending numerous lawsuits, including at least one securities class action, consumer action, and environmental protection suit based on violations of California laws.  *See Kiken v. Lumber Liquidators Holdings, Inc., et al.*, No. 4:13-cv-00157-AWA-DEM (E.D. Va.); *Williamson v. Lumber*

---

[3]     The author of the *SeekingAlpha.com* article, Xuhua Zhou, wrote a follow-up article on June 24, 2013, observing that rather than responding to or acknowledging the test results, Lumber Liquidators instead initiated a clearance sale to offload its existing inventory: "Despite having offered to send the company my noncompliant sample and the relevant lab reports, I have yet to correspond with anyone from Lumber Liquidators. Instead, *Lumber Liquidators initiated an End of Quarter CLEARANCE sale for all its flooring products per a marketing email received this Sunday. The company chose not to follow up on credible questions raised about its product safety and instead launched a marketing sales campaign to get rid of existing inventory faster*. . . . [I]t is hardly a responsible decision on the part of Lumber Liquidators." *See* http://seekingalpha.com/article/1517322-lumber-liquidators-managements-silence-and-brokers-rebuttal-may-validate-the-worst-fear.

*Liquidators Holdings, Inc.*, No. 1:13-cv-01487-AJT-TCB (E.D. Va.); *Global Community Monitor v. Lumber Liquidators Inc.*, No. RG14733979 (Cal. Super. Ct. Alameda Cnty.).

62.     Defendant Schlegel, the Company's Chief Merchandising Officer, and defendant Lynch, the Company's President and CEO, were directly involved in choosing the suppliers of the Company's wood products, personally visiting mills and manufacturers in China on multiple occasions between 2011 and 2013. For example, during an analyst conference on September 7, 2011, then-CEO defendant Griffiths stated: "We brought in our President, Rob Lynch and our Senior VP of Merchandising, Bill Schlegel. Both of them have extensive experience in direct sourcing in China and they are actually both there in China today working on some of those initiatives."

63.     On an August 16, 2012 conference call with analysts for the Canaccord Genuity Global Growth Conference, defendant Lynch identified the Company's sourcing as its "key competitive advantage" in its price, selection and quality: "Our sourcing, direct sourcing is a key competitive advantage in our price, selection and quality in our stores. . . . Quality and availability – because we work directly with the mills, we better control the quality of the product . . . ."

64.     On a July 24, 2013 conference call following the release of the Company's second quarter 2013 results, defendant Lynch discussed the quality and sourcing of the Company's products, stating that "our mills comply with our product specs, because we have personnel on the ground, in the mills. . . . [W]e don't rely on a distributor to measure and control our quality. . . . We do stringent testing of our products at multiple levels beyond what's required. Our products are tested by third-party experts, both at the mill and in off-site labs . . . . And we also go in and do random tests at the mill." Emphasizing his and management's knowledge of the Company's sourcing practices, defendant Lynch stated: "I'd like to spend a few minutes today on quality, which is fundamentally important to the success of our premium brands and key to a loyal customer base. Sourcing directly from the mill provides the foundation for our entire value proposition. Due to our

scale, we often purchase the majority of our mill partner's capacity. And, as a result, we have

insight and visibility throughout the sourcing process."

65. On the same call, with respect to regulatory compliance, Lynch stated:

Our commitment to quality begins with well-designed product specifications, followed by strict adherence to a set of internal standards set well above regulatory requirements. Because of these standards, the products we sell nationally exceed the most stringent requirements of any state.

We have developed quality control and assurance processes for our products that we believe lead our industry. Due to our international sourcing, we have more than 60 professionals around the world, including in the U.S., Canada, China and South America, who perform and monitor those processes that we believe are most effectively executed on the ground at the mill.

We augment the on-site controls with additional testing in both our own labs and in independent certified facilities. The combination of our on-site controls and our additional testing is designed to ensure that our [products] exceed the highest regulatory requirements and meet our more stringent internal quality standards. As national standards are developed around product quality, construction, and packaging, we will engage in and intend to lead our industry in the process.

66. Indeed, defendant Lynch boasted that he and Schlegel were personally well aware of

the workings at the mills in China. During an August 14, 2013 analyst conference, in response to a

question by an analyst requesting additional detail regarding the Company's "sourcing strategies and

any advantage you have there," Lynch stated: "[W]e absolutely have a world-class sourcing team.

Our chief merchant, Bill Schlegel, and the team that he has built under him is better than I've ever

seen in my career. . . . In fact, we just did a line review recently in the last couple of weeks in China.

We did an engineer line review. And some of the feedback we got from the mills were [sic] how

impressed they were with how closely we work with them; how we are out in the markets, in their

territories, walking their mills with them, interacting with them and building those relationships."

67. On February 25, 2015, the Company disclosed, during its 2014 fiscal year and fourth

quarter earnings call, that *60 Minutes* would "feature our Company in an unfavorable light with

regard to our sourcing and product quality, specifically related to laminates. We believe their story

will be a derivative of the Prop 65 matter and *Balero* matter disclosed in our 10-K." Nonetheless,

the Company falsely assured investors that "[e]very media inquiry provides an opportunity for us to reiterate our firm commitment to the safety and quality of our products. . . . Our rigorous quality control processes include steps designed to ensure compliance with the low-emission standards set by CARB. Although CARB regulations are only applicable in California, we apply these stringent standards to subject products and we sell everywhere we do business. . . . As a result of our continuous commitment to quality, the products you buy at Lumber Liquidators meet CARB standards and are absolutely safe. . . . We don't just follow the letter of the law, we set the bar even higher so that our customers enjoy the best the safest products in the world." In response to this information, in part, the Company's stock price fell over 26%, from a close of $68.78 per share on February 24, 2015 to a close of $50.63 per share on February 25, 2015.

68.     On March 1, 2015, the damning *60 Minutes* program aired. The program explained that Lumber Liquidators' Chinese-manufactured laminate flooring, likely found in "tens of thousands of California households" and nationwide in "hundreds of thousands" of homes, exceeded California formaldehyde standards by *six to seven-fold*, on average. In some cases, formaldehyde levels were found to be *twenty times* the levels permitted by California law. The show's guests stated that "it's a level that the U.S. EPA calls polluted indoor conditions." One of the show's guests, a doctor specializing in environmental pediatrics and exposure to toxic chemicals, stated that "long-term exposure at [the emission] level [measured from Lumber Liquidators' laminate products] would be risky because it would increase the risk for chronic respiratory irritation, change in a person's lung function, [and] increased risk of asthma." The doctor also stated that "children [would] be the people most likely to show symptoms at that sort of level." Moreover, "formaldehyde can cause myeloid leukemia and nasopharyngeal cancer at high levels and respiratory issues as well as eye, nose and throat irritation at even low levels."

69. *60 Minutes* also pointed out that Lumber Liquidators' website "promise[d] that all of their flooring 'meets or exceeds rigorous emissions standards' and they say 'we not only comply with laws, we exceed them.'" One of the show's guests emphatically stated that these were "not . . . true" statements and that it was "illegal to sell these boxes of wood in California. We hope that they will not sell these products anywhere in the nation, because they are above the health-based standards the state law has set."

70. The *60 Minutes* host explained that California regulations have "strict standards for how much of the chemical the core boards in laminate flooring can emit. Every box of laminate flooring Lumber Liquidators sells carries this label – stating it's CARB Phase 2 Compliant – CARB is an acronym for the California Air Resources Board, which sets strict standards for formaldehyde emissions in wood flooring. Congress adopted California's limits when it passed the Formaldehyde Standards Act in 2010." In order to determine if Lumber Liquidators' laminate products purchased outside of California would produce the same emissions results, *60 Minutes* purchased 31 boxes of Chinese-made laminate flooring from Virginia, Florida, Texas, Illinois and New York. The results were as predicted – only one of the samples was compliant with formaldehyde emissions standards. "Some were more than 13x over the California limit. Both labs told [*60 Minutes*] they had never seen formaldehyde levels that high."

71. One of the show's guests, Whitney Tilson, a Wall Street hedge fund manager stated: "In 16 years of professional money management, I've seen hundreds of companies do all sorts of bad things to get their stock prices up. But this has got to be the worst." "Six months after he bet millions the stock would go down, Whitney Tilson got tipped off by someone familiar with Lumber Liquidators' operations in China, who said he was missing the bigger story." "The much bigger story, he said is that Lumber Liquidators was almost certainly purchasing formaldehyde-tainted laminated flooring in China [because] [i]t's cheaper and – it reduces the cost by about 10 percent."

72.     The program then showed footage of an undercover investigator hired by *60 Minutes* to visit three Chinese mills, in the city of Changzhou, which produced laminate flooring for Lumber Liquidators. "Employees at the mills openly admitted that they use core boards with higher levels of formaldehyde to make Lumber Liquidators laminates, saving the company 10-15 percent on the price. At all three mills, they also admitted to falsely labeling the company's laminate flooring as CARB 2, meaning it meets California formaldehyde emissions standards, and the new U.S. federal law. At this factory, the general manager told investigators Lumber Liquidators is one of their biggest customers":

**Manager:** This is a best-seller for Lumber Liquidators.

**Investigator:** For Lumber Liquidators?

**Manager:** Yeah.

**Investigator:** How long have you been selling this?

**Manager:** From last year.

**Investigator:** Is this CARB 2?

                    *      *      *

**Manager:** No, no, no . . . I have to be honest with you. It's not CARB 2.

**Investigator:** Can I get CARB 2?

**Manager:** Yes, you can. It's just the price issue. We can make CARB 2 but it would be very expensive.

73.     When confronted with this information, defendant Sullivan, Lumber Liquidators' founder and Chairman, stated: "[W]e're never gonna sell something unsafe." And when pointedly asked whether anybody had "ever reported this to you?" Sullivan avoided the question, answering that "Again, we will investigate it. If there is anything going on, we will stop it immediately. I don't know if it's true or not. I don't know what the whole story is, but we will investigate it immediately." When the *60 Minutes* host pointed out to Sullivan: "It certainly calls into question not just these mills, but it calls into question your oversight of these mills," Sullivan candidly responded,

"It could, yes." *See* http://www.cbsnews.com/news/lumber-liquidators-linked-to-health-and-safety-violations.

74.     The following day, on March 2, 2015, the Company's stock price fell again, this time over 25%, from a close of $51.86 per share on February 27, 2015, to a close of $38.83 per share on March 2, 2015, wiping out another $1,484,898,800.00 in shareholder equity.

75.     On March 10, 2015, *The New York Times* reported that New York's Attorney General, Eric T. Schneiderman, had opened an inquiry into whether the Company violated safety standards and that safety officials in California were also likely to investigate.

**Product Sourcing**

76.     Originally passed in 1900, the Lacey Act originally made it a federal crime to poach game in one state with the purpose of selling the bounty in another. The Lacey Act was amended on May 22, 2008, when the Food, Conservation, and Energy Act of 2008 expanded its protection to a broader range of plants and plant products, including timber (§8204, Prevention of Illegal Logging Practices).

77.     Notably, the 2008 amendments to the Lacey Act made it illegal to import, export, transport, sell, receive, acquire or purchase in interstate or foreign commerce timber taken or traded in violation of the laws of the United States, a U.S. State, or relevant foreign law. Penalties for Lacey Act violations include civil fines of up to $10,000 per violation, criminal penalties (including additional fines and jail time), and forfeiture. Penalties vary in severity based on the violator's level of knowledge about the products – penalties are higher for those who knew or should have known through the exercise of due care that they were trading in illegally harvested materials. The Lacey Act also requires that importers of covered products – in this case, wood or wood products – exercise "due care" in identifying the source of goods.

78. On September 26, 2013, special agents from the Immigration and Customs Enforcement's Homeland Security Investigations unit, together with the FWS and the DOJ, raided Lumber Liquidators' corporate offices in Toano and Richmond, Virginia. Prior to this raid, the federal authorities had received an advanced copy of the Environmental Investigation Agency ("EIA") Report entitled "Liquidating the Forests" (the "EIA Report"). According to sources and a search warrant filed in Virginia that pertained to the raids, the federal authorities were looking for evidence the Company had knowingly imported wood harvested from the habitat of the endangered Siberian tiger.[4]

79. In response to the raid, defendants caused Lumber Liquidators to issue a press release on September 27, 2013, stating:

> Yesterday, sealed search warrants were executed at the Company's corporate offices in Toano and Richmond, Virginia by the Department of Homeland Security's Immigration and Customs Enforcement and the U.S. Fish and Wildlife Service. The Company takes its sourcing and compliance very seriously, and is cooperating with authorities to provide them with requested information.
>
> Lumber Liquidators sources its products directly from approximately 110 domestic and international mills around the world. As a result of the normal course of business, the Company is subject to a range of international and domestic regulations. Due to the scale of its international and domestic operations, *Lumber Liquidators has policies and procedures in place for the sourcing, harvesting and manufacturing of its products designed to comply with federal and other regulations related to the importation of wood flooring products. The Company has more than 60 professionals around the world who perform and monitor those processes. Quality is a key component of Lumber Liquidators' value proposition, and through its commitment to continuous improvement, the Company invests significant resources for quality control and assurance.*

80. On this news, the price of Lumber Liquidators' shares declined $5.83 per share, or more than 5%, to close at $107.13 per share on September 27, 2013, wiping out another $160 million in shareholder equity.

---

[4]  Illegal logging has numerous devastating consequences. For example, clear cutting, a practice that still accounts for 75% of all logging in Russia, has caused certain areas of permafrost forests in northeastern Russia to become "virtual deserts," and the release of methane from these degraded permafrost zones is a major source of greenhouse gas emissions.

81.     On October 9, 2013, *The Wall Street Journal* reported that the EIA, a non-profit organization that conducts undercover investigations to expose environmental crimes around the world and seeks to increase government enforcement of laws relating to global trade in wildlife and environmental products through advocacy and publications, had provided advanced copies of the detailed EIA Report to federal authorities prior to the government raid. The EIA Report, which EIA made public on or around October 9, 2013, documented the results of a multi-year undercover investigation into illegal logging in the RFE, a heavily forested region near Russia's border with China which provides the habitat for the last 450 Siberian tigers in the world.

82.     According to the EIA Report, a Chinese-owned wood-flooring company called Suifenhe Xingjia Economic and Trade Company ("Xingjia"), with three factories in northeastern China and at least 14 sawmills throughout the RFE, was the company of greatest concern with respect to illegal logging operations in the RFE. Among other things, the EIA Report alleges that Xingjia conducts its illegal logging in the RFE through falsified documents and bribes to local Russian officials.

83.     The EIA Report further alleges that analysis of U.S. import records and other undercover sources indicates that Xingjia's largest customer is Lumber Liquidators. According to the EIA Report, Lumber Liquidators has done business with Xingjia since at least 2007. The EIA Report further claims that the head of Lumber Liquidators' sourcing operations, including the Company's U.S. head of sourcing, defendant Schlegel, visited Xingjia's office and sawmills in the RFE several times in 2011 and 2012, including in May of 2012, and that thereafter Lumber Liquidators made Xingjia its chief Chinese supplier of solid oak flooring. The EIA Report includes photos of what are alleged to be boxes of oak flooring stacked at one of Xingjia's factories bearing one of Lumber Liquidators' proprietary flooring brands, Virginia Mill Works, which Xingjia admitted to EIA contained oak from Russia.

84.     In late 2011, in conversations with EIA undercover investigators posing as potential buyers, the president of Xingjia, Mr. Sun, during their very first meeting, openly revealed that much of Xingjia's operations involved illegally harvested protected wood in Russia and that they also were illegally over-harvesting wood on their own land in China. According to Mr. Sun, he gave a similar tour to a high-level U.S. management team of senior executives from Lumber Liquidators.

85.     Xingjia officials also openly described Xingjia's detailed system for sourcing illegal timber – illegally cutting outside of their concession boundaries, overcutting within those boundaries, and purchasing over 90% of their stock from trading companies throughout the RFE that do not provide the required proof of legal sourcing. Xingjia officials also openly revealed to EIA investigators that their illegal operations were maintained through bribery and high-level political connections with both Russian and Chinese officials.

86.     Numerous suppliers identified by Xingjia had strong ties to illegal logging. For example, three employees of one supplier identified by Xingjia, including its head of timber harvesting, were sentenced to prison in 2010 for illegal logging, and more company employees are currently under investigation. A different supplier is the subject of a sweeping investigation into illegal logging. These are the two largest cases of illegal logging to be uncovered in Khabarovsk Province in the past three years, and both firms under investigation (Beryozoviy and Investstroy) are Xingjia suppliers. According to EIA investigators, Xingjia openly acknowledged these companies were sources for their wood.

87.     Xingjia's connection to illegal sourcing would be obvious to anyone doing business with Xingjia. The EIA Report states that numerous sources throughout the RFE reported to undercover EIA investigators that at least 80% of all trees harvested in the area are done so illegally: "EIA's investigation clearly illustrates that Xingjia's oak supplies are riddled with illegal sources and that it is immediately apparent to anybody who asks them where their wood originates. U.S.

import data and statements from Xingjia officials confirm that Lumber Liquidators is far from 'anybody,' and in fact is their single most prominent customer of oak flooring."

88.     Moreover, according to the EIA Report, the illegal sourcing of Lumber Liquidators' Chinese flooring products was verified through independent testing:

> During visits to Chinese manufacturers, EIA was given samples of boards and manufactured flooring by six companies exporting to the U.S. and EU. Eleven of these samples were provided by representatives from both the Suifenhe and Dalian facilities of Xingjia, the key supplier to Lumber Liquidators. Five of these eleven samples were cut from a batch of flooring which EIA observed Xingjia workers preparing for shipment to Lumber Liquidators. EIA sent these samples to a respected laboratory with decades of expertise in stable isotopic analysis for testing. Preliminary results from stable isotopic analysis indicated that every sample provided was Russian in origin. For 18 out of 20 of these samples, the analysis gave a confidence level of 95% or greater. These results indicate that all of the samples received from Xingjia were likely sourced from the forests of Khabarovsk Province – the forests where the company claimed to be sourcing, and where their suppliers have previously been convicted of, and are currently suspected of, illegal logging.

(Footnote omitted.)

89.     Zhejiang Dadongwu Greenhome ("Greenhome"), a flooring company located near Shanghai, and a primary supplier of hand-scraped solid flooring to Lumber Liquidators in 2011, reported to EIA investigators that although it regularly imports oak logs from Germany, those logs are supplied by mills (including Xingjia) that harvest from Russia. Greenhome told EIA investigators that Lumber Liquidators (who is aware of the true harvesting/sourcing) declared all shipments from Greenhome were from Germany on the declaration forms required under the Lacey Act because the "'U.S. market and government don't like [wood from] Russia.'"

90.     These allegations are in direct contrast to Lumber Liquidators' repeated, detailed representations on its product labels, website, and elsewhere that its lumber sourcing "complies with U.S. laws and regulations including the Lacey Act."

91.     Nonetheless, Lumber Liquidators continued issuing false statements regarding its compliance with the Lacey Act and environmental protection laws. On an October 23, 2013

conference call, following the release of the Company's third quarter 2013 results, defendant Lynch addressed the sealed search warrant issued by federal authorities and denied that the Company engaged in any illegal sourcing:

> I can assure you of our commitment to uncompromising integrity and ethical business conduct across all areas of Lumber Liquidators' operations. We expect and require the same of our suppliers. Working together, we strive to advance responsible forest management.

> *        *        *

> Once we establish a mill relationship, we monitor and enforce our specifications and practices through more than 60 employees dedicated to quality control and assurance located on the ground in the U.S., Canada, China and South America.

> We invest significant time and resources to safeguard quality and enforce produce compliance, and we terminate relationships with suppliers we believe are not adhering to those standards.

92.     On November 21, 2013, well-known hedge fund manager Whitney Tilson criticized the Company for importing illegally sourced timber from Russia in direct violation of U.S. laws. Tilson explained that the Company was only able to maintain its unbelievably high margins, and thus inflate its revenues, as a result of importing illegal timber. Tilson suggested that Lumber Liquidators would likely have to immediately clean up its supply chain, potentially increasing the Company's timber-sourcing costs, and stated:

> I'm skeptical that this is an isolated problem limited to one rogue supplier. Rather, the combination of a) the evidence in the EIA report, b) the unusually rapid increase in Lumber Liquidators' margins to unprecedented levels immediately after acquiring a Chinese supply chain company [Sequoia], and c) the hugely corrupt business environment in both Russia and China lead me to believe that Lumber Liquidators has a big problem on its hands. ***Though I can't prove it, the evidence I see, combined with common sense, makes me think it's highly likely that what EIA has uncovered is a pervasive problem across Lumber Liquidators' Chinese supply chain.***

93.     On this news the price of the Company's shares fell over $16.07 per share, or over 13%, to $99.29 per share over two trading sessions. This resulted in a $440 million reduction in shareholder equity.

94.     On a February 19, 2014 conference call, following the release of the Company's 2013 fourth quarter and full year results, Lynch stated that "[t]he direct sourcing relationships we have with our mills around the world have never been stronger which enables us to offer the highest quality merchandise . . . .   [We] have always been and remain committed to uncompromising integrity and ethical business conduct across all areas of the company's operations.   We expect and require the same of our suppliers and work together to advance responsible forest management."

95.     On the same call, in reference to the federal search warrant served in September 2013, Lynch stated:

> In combination with our internal team, we have engaged in third-party resources, including forensic specialists, to review our sourcing in Northern China.
>
> These review efforts are in addition to our continuing investment in product sourcing processes and practices over the last two years. I remain confident in these processes and practices, which are designed to elicit adherence to our comprehensive standards for quality and compliance, which we believe exceed industry standards.

96.     On February 25, 2015, in addition to disclosing that the Company expected the *60 Minutes* broadcast to feature them in a negative light, Lumber Liquidators disclosed in its Form 10-K for the fiscal year ending December 31, 2014, that "[i]n recent communications, the DOJ indicated that it is contemplating seeking criminal charges under the Lacey Act. . . .   At this time, the Company does not have enough information to estimate a reasonably possible loss or range of loss that may result from actions by the DOJ as a result of its investigation."

**Defendants' Breach of Loyalty (and Candor and Good Faith)**

97.     As directors and/or officers of Lumber Liquidators, defendants owed Lumber Liquidators a fiduciary duty to implement and maintain internal controls and policies to ensure compliance with the CARB Regulations and the Lacey Act, among other environmental and consumer protection rules and regulations.   Defendants were fully aware that Lumber Liquidators' international business operations triggered compliance obligations under these rules and regulations. This is because compliance with the statutes, laws, rules and regulations applicable to Lumber

Liquidators' business and affairs was not optional for the Lumber Liquidators' Board. Instead, they were duty-bound to implement and maintain internal controls and policies necessary for Lumber Liquidators to discharge its legal obligations under state and federal law. In fact, defendants (except Taylors, Daniels, Griffiths and Schlegel) each signed the Company's 2011 Form 10-K, filed with the SEC on February 22, 2012, acknowledging these obligations and falsely representing that the Company was in compliance with them:

> Our operations and properties are also subject to federal, provincial, state and local laws and regulations relating to the use, storage, handling, generation, transportation, treatment, emission, release, discharge and disposal of hazardous materials, substances and wastes . . . . We do not incur significant costs complying with environmental laws and regulations. . . .

> Our suppliers are subject to the laws and regulations of their home countries, including in particular laws regulating forestry and the environment. We consult with our suppliers as appropriate to ensure that they are in compliance with their applicable home country laws. We also support social and environmental responsibility among our supplier community and our suppliers agree to comply with our expectations concerning environmental, labor and health and safety matters. Those expectations include representations and warranties that our suppliers comply with the laws, rules and regulations of the countries in which they operate.

> Products that we import into the United States and Canada are subject to laws and regulations imposed in conjunction with such importation, including those issued and/or enforced by U.S. Customs and Border Protection and the Canadian Border Services Agency. *In addition, certain of our products are subject to laws and regulations relating to the importation, acquisition or sale of illegally harvested plants and plant products and the emissions of hazardous materials. We work closely with our suppliers to ensure compliance with the applicable laws and regulations in these areas.*

> *We believe that we currently conduct, and in the past have conducted, our activities and operations in substantial compliance with applicable laws and regulations relating to the environment and protection of natural resources*, and believe that any costs arising from such laws and regulations will not have a material adverse effect on our financial condition and results of operations.

The Company's 2012, 2013 and 2014 Forms 10-K, filed with the SEC on February 20, 2013, February 19, 2014, and February 25, 2015, respectively, and signed by the same defendants, contained substantially identical language.[5]

98. Moreover, defendants were fully aware of the risks of importing wood from China – a country often associated with the export of wood products with excess formaldehyde levels and illegally sourced timber. For example, in February 2012, the leading Chinese hardwood flooring company, Anxin Weiguang Flooring, was forced to pull its wood flooring products from shelves pending an investigation by Shanghai's Bureau of Supervision, Inspection and Quarantine because of claims that the flooring emitted excessive levels of formaldehyde. One study, entitled "Formaldehyde in China: Production, consumption, exposure levels, and health effects," 35 Environment Int'l (Nov. 2009), found that over the last 20 years, China's formaldehyde industry has experienced unprecedented growth, and now produces and consumes one-third of the world's formaldehyde. More than 65% of the Chinese formaldehyde output is used to produce resins which are mainly found in wood products. These are also the major source of indoor air pollution in China. The study documented numerous instances of hazardous occupational exposure to formaldehyde in Chinese wood workers.

99. Despite this knowledge, defendants did not proactively manage Lumber Liquidators' risk and/or compliance associated with regulations related to its importation, manufacture, sale and distribution of Chinese flooring. In fact, defendants admitted as much in Lumber Liquidators' 2012 Annual Report filed with the SEC on Form 10-K on February 20, 2013, when they caused the Company to report that its "experience with the legal and regulatory practices and requirements in China is limited." As a result of defendants' failure to institute sufficient controls, Lumber Liquidators has been severely injured by the violations of CARB Regulations, the Lacey Act, and

---

[5] Defendant Taylor signed the 2014 Form 10-K filed with the SEC on February 25, 2015.

other rules and regulations that arose in the absence of the aforementioned internal systems and policies.

100.    Corporate directors may be held personally liable to the corporation for damages arising from their failure to timely act when faced with a known duty to act, such as the corporation's obligation to comply with the statutes, laws, rules and regulations applicable to its business and affairs.   The duty to implement internal systems and policies for compliance with CARB Regulations, the Lacey Act, and other environment and consumer protection rules and regulations fell squarely upon Lumber Liquidators' Board; yet they failed to act. Accordingly, defendants breached their duty of loyalty to Lumber Liquidators and are liable for the resulting damages.

**Defendants' False and Misleading Statements and Omissions**

101.    During the course of defendants' scheme to generate revenue at the expense of complying with federal and state law, defendants issued several reports to Lumber Liquidators' shareholders in which they trumpeted the quality of the Company's timber and the Company's sourcing practices. These reports, signed by defendants as indicated below and in ¶¶102-105, were false and misleading when issued because defendants failed to disclose that Lumber Liquidators was selling illegally sourced and toxic products to its customers, which constituted an additional breach of the fiduciary duties they each owed to the Company.

102.    For example, on February 22, 2012, defendants caused Lumber Liquidators to file with the SEC its 2011 Form 10-K for the year ended December 31, 2011. The Form 10-K, signed by defendants Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Wade and Terrell, stated:

> Our value proposition to the customer is a key driver of our business. Important components include:
>
> •    *Price*. A fundamental part of our business model is to provide quality hardwood flooring at everyday low prices. We are able to maintain these prices across our product range because we generally purchase flooring directly from mills.

\*     \*     \*

- **Quality.** We believe that we have achieved a reputation for quality, and that our proprietary brands are recognized for excellence by our customers. We work directly with our supplier mills to source and produce flooring that will meet our high quality standards.

\*     \*     \*

We work directly with a select group of vendors and mills with whom we have cultivated relationships that provide for a consistent supply of high-quality product at the lowest prices. As part of ensuring the high-quality nature of our brands, we have developed demanding product standards. . . . We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our specifications.

We currently purchase products from approximately 120 domestic and international vendors, which are primarily mills or trading companies. Trading companies contract with mills, located primarily in China, to produce quality products to our specifications, work on our behalf to control quality at the mill locations and handle certain other matters. In 2011, one of the trading companies, Sequoia Floorings Inc. ("Sequoia"), provided services on approximately one-third of our merchandise purchases, primarily in Asia. In September 2011, we entered into an agreement to acquire certain assets of Sequoia relating to Sequoia's quality control and assurance, product development, claims management and logistics operations in China. Our top 10 suppliers, including Sequoia, accounted for approximately 70% of our supply purchases in 2011. We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. . . . In 2011, approximately 42% of our product was sourced from Asia, 50% from North America, 7% from South America and 1% from other locations, including Europe and Australia.

103.    Similarly, on February 20, 2013, defendants caused Lumber Liquidators to file with the SEC its 2012 Form 10-K for the year ended December 31, 2012. The Form 10-K, signed by defendants Lynch, Sullivan, Brock, Moore, Presley, Robinson, Roper, Wade and Terrell, stated:

### Sourcing Direct from the Mill

*Our Suppliers.* We believe that our vertically integrated business model enables us to offer a broad assortment of high-quality products to our customers at a lower cost than our competitors. We work directly with a select group of vendors and mills with whom we have cultivated strong relationships that provide for a consistent supply of our products. We select suppliers based on a variety of factors, including their ability to supply products that meet industry grading standards and our demanding product specifications, which support the high-quality nature of our brands. We believe that we are the largest customer for most of our suppliers, which we believe enables us to obtain better prices in some circumstances. . . .

. . . In 2012, approximately 43% of our product was sourced from Asia, 50% from North America, 6% from South America and 1% from other locations, including Europe and Australia. . . .

*Sourcing Initiatives.* In 2011, we began a process to continually challenge, and ultimately strengthen, the structure of our sourcing relationships with the best international and domestic mills. Our sourcing initiatives play a key role in maintaining the best combination of quality and value in our product assortment . . . . These initiatives are segregated into three primary areas, which are being implemented independently over a multi-year time frame, as follows:

\*      \*      \*

- Current and potential mill partners' participation in competitive line reviews of specific merchandise categories to evaluate breadth of assortment, quality, logistics and product cost; and

- Direct sourcing with international and domestic mills to control product cost and quality, enhance forecasting and broaden our product assortment.

104.    On February 19, 2014, defendants caused Lumber Liquidators to file with the SEC its 2013 Form 10-K for the year ended December 31, 2013. The Form 10-K, signed by defendants Lynch, Terrell, Sullivan, Brock, Moore, Presley, Robinson, Roper and Wade, falsely stated:

We invest significant resources to design and produce products of the highest quality . . . . Proprietary brands, supported by [our direct] relationships [with mills], allow us greater control over product design and production, which we monitor through an expansive network of experienced quality control and assurance professionals positioned both at the mill and at our distribution facilities.

\*      \*      \*

We believe sourcing directly from mills enables us to offer a broad assortment of high-quality . . . products . . . at a consistently lower cost than our competitors. We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. . . . *We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at the mills, coordinating inspection and assurance procedures. . . . We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.*

\*      \*      \*

*We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition.  The scale of our purchasing*

> *and diversity of products require sustainable forestry. We invest significant time and resources to safeguard quality and comply with regulatory requirements. We discontinue sourcing from suppliers not adhering to our standards. We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product.*

*        *        *

> We seek the highest quality at the best value, in consideration of where the raw material grows.

105.    On February 25, 2015, defendants caused Lumber Liquidators to file with the SEC its

2014 Form 10-K for the year ended December 31, 2014.  The Form 10-K, signed by defendants

Lynch, Terrell, Sullivan, Brock, Moore, Presley, Robinson, Roper, Wade and Taylor, falsely stated:

> We invest significant resources to design and produce products of the highest quality . . . . Proprietary brands . . . allow us greater control over product design and production, which we monitor through an expansive network of experienced quality control and assurance professionals.

*        *        *

> We believe sourcing directly from mills enables us to offer a broad assortment of high-quality . . . products . . . at a consistently lower cost than our competitors.  We seek to establish strong relationships with mills around the world where the significance of our scale, breadth of assortment and liquidity allow for both higher quality and lower cost. . . . *We are able to set demanding specifications for product quality and our own quality control and assurance teams are on-site at certain mills, coordinating inspection and assurance procedures. . . .*
>
> *We seek long-term, core relationships with mills committed to our demanding product specifications, sustainable supply and regulatory compliance.*

*        *        *

> *We are committed to uncompromising integrity across our operations, and quality is a key component of our value proposition. . . . [T]he scale of our purchasing and diversity of products require sustainable forestry.  We invest significant time and resources to safeguard quality and comply with regulatory requirements.  We discontinue sourcing from suppliers not adhering to our standards.  We seek long-term relationships with mills that can provide sustainable and growing supplies of high-quality product. . . . .*

*        *        *

> We seek the highest quality at the best value, in consideration of where the raw material grows . . . .

- 39 -

106.    At least as early as April 6, 2012, the Company's website represented, under the

heading "Eco-friendly Flooring," that "Our flooring comes from managed forests," stating:

> Lumber Liquidators offers flooring brands that practice responsible
> harvesting. . . . Tree cutting is monitored very carefully within a selective cutting
> and replanting strategy. . . .
>
> . . . Flooring mills must submit harvesting plans to the local government for
> approval.  As part of this process, they map and grid the land affected and take an
> inventory of the trees (size and species) in each grid.  The government will then
> approve the plan and the mills must cut to it.  There are limitations on the number
> and size of each species that can be harvested from each grid and then they must
> move to the next grid.  Once a grid is harvested, they cannot go back there until 30
> years has passed.[6]

107.    At least as early as November 11, 2012, the Company's website represented that the

Company ensures that every supplier complies with the Company's "Supplier Code of Conduct with

Respect to Environmental and Social Responsibility":

> Since 2007, each of our suppliers has been required to comply with our
> supplier code of conduct. . . .
>
> Over the years, we have worked directly with a select group of vendors and
> mills with whom we have cultivated long-standing relationships.  We often pay
> announced and unannounced visits to our suppliers' mills and forests and assess their
> adherence to our code of conduct and its protocols . . . .  In many cases, we visit
> potential suppliers to assess their ability to comply with our environmental and social
> policies prior to ordering products from them. . . .
>
> In the event we learn that any employee or supplier has engaged in behavior
> that has violated our policies, we would take appropriate remedial action.[7]

108.    The Company's marketing materials, including the Company's website, specifically

represent to consumers that the Company's Chinese flooring products comply with the formaldehyde

emission regulations propounded by CARB and, indeed, comply with even stricter European Union

formaldehyde standards:

---

[6]    *See*        http://web.archive.org/web/20130716135521/http://www.lumberliquidators.com/ll/
flooring/ECOfriendly.

[7]    *See*    http://web.archive.org/web/20131020150207/http://www.lumberliquidators.com/assets/
images/product_page/California_Supply_Chains_Act.pdf.

All laminates and engineered flooring products sold by Lumber Liquidators are purchased from mills whose production method has been certified by a Third Party Certifier approved by the State of California to meet the CARB standards. . . .

Though it currently applies only to products sold in California, Lumber Liquidators made a decision to require all of our suppliers to comply with CARB regardless of whether we intended to sell the products in California or any other state/country. In addition, our suppliers manufacture their products in accordance with the European standard which has stricter guidelines than the California [sic].

In addition to the CARB requirements, Lumber Liquidators regularly selects one or more products from each of its suppliers and submits them for independent third-party lab testing. This is done as a monitoring activity to validate ongoing compliance.[8]

## DEFENDANTS CAUSED THE COMPANY TO REPURCHASE STOCK AT ARTIFICIALLY INFLATED PRICES

109.   As described herein, defendants' hid from shareholders the true origin and safety of its wood flooring products, which caused Lumber Liquidators' stock price to trade at artificially inflated prices. Despite knowing that the Company's stock price was artificially inflated, defendants authorized the repurchase of up to $150 million in Company stock.

110.   The Company announced a series of stock repurchases starting on February 22, 2012, and again on November 15, 2012 and February 19, 2014, for up to $50 million each. Defendants ultimately caused the Company to repurchase 2,723,607 shares for $135,272,000.

111.   The following table represents the Company's stock repurchase activity through the quarter ending December 31, 2014:

| Year Ended December 31, | 2014 | 2013 | 2012 |
|---|---|---|---|
| Shares Repurchased | 671,200 | 403,630 | 1,648,777 |
| Average Price per Share | $77.68 | $84.40 | $29.74 |
| Total Aggregate Costs | $52,138,000 | $34,066,000 | $49,068,000 |

---

[8]   *See*   http://t.lumberliquidators.com/view_question!PAGETYPE?sf=101133&documentid=415037&action=view.

112.    By causing the Company to repurchase stock when they knew the true state of Lumber Liquidators' business and financial prospects, defendants purchased the Company's stock at artificially inflated prices.  Once the true facts emerged, the Company's stock plunged, trading at $30.78 per share as of March 31, 2015 – wiping out over $1.2 billion in shareholder equity.  On September 28, 2011, the day prior to Company's announcement that it would purchase Sequoia, Lumber Liquidators' stock traded at $15.54 per share.  Thus, by repurchasing the stock at $29.74, $84.40 and $77.68 per share, defendants caused the Company to repurchase its stock at significantly inflated prices.

113.    Defendants' decision was not a valid exercise of business judgment because defendants knew the true state of Lumber Liquidators' business and financial condition when they authorized the stock repurchases.  Moreover, defendants knew that the Company's future growth and profits were not sustainable because the massive increase in Lumber Liquidators' margins was due to the use of illegally harvested wood and manufacturing processes that did not comply with state and federal environmental laws and regulations.  The repurchases falsely signaled to the Company's shareholders and the public that the purchase of the Company's stock at those prices was the best use of the Company's cash and that purchases of the stock at the market price prevailing at that time represented a good value for the Company.

114.    Thus, defendants breached their fiduciary duties by causing the Company to purchase its own shares at artificially inflated prices.

## DAMAGE TO LUMBER LIQUIDATORS

115.    Lumber Liquidators has been, and will continue to be, severely damaged and injured by defendants' misconduct.  Further, as a direct and proximate result of defendants' breach of their duties of loyalty, candor and good faith, Lumber Liquidators has expended and will continue to expend significant sums of money.  These expenditures include, but are not limited to: (i) costs

incurred from the investigations into the formaldehyde emission concentrations and sourcing of the Company's Chinese flooring products that resulted in violations of applicable standards and laws; (ii) costs incurred from the compensation and benefits paid to the defendants who breached their fiduciary duties to the Company; (iii) the fines, penalties and disgorgement resulting from the Company's violations of environmental and consumer protection standards; (iv) costs of defending against at least one securities class action lawsuit alleging violations of the federal securities laws and two other actions alleging violations of the Racketeer Influenced & Corrupt Organizations Act and other consumer protection statutes; (v) the cost of implementing controls sufficient to ensure compliance with applicable environmental and consumer protection standards, rules and regulations going forward; and (vi) the cost of responding to the inquiries of state attorneys general and other safety officials, including that of New York Attorney General Eric T. Schneiderman.

116.    In addition, Lumber Liquidators' business, goodwill and reputation with its customers, business partners, regulators and shareholders have been gravely impaired. Moreover, these actions have irreparably damaged Lumber Liquidators' "environmentally conscientious" corporate image. For at least the foreseeable future, Lumber Liquidators will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in improper behavior and have misled the investing public, such that Lumber Liquidators' ability to raise equity capital or debt on favorable terms in the future is now impaired.

117.    Nevertheless, the Lumber Liquidators Board has taken no action against the directors and officers responsible for the damage and injury to the Company, including themselves. By this action, plaintiff seeks redress for and vindication of Lumber Liquidators' rights against its wayward fiduciaries.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff incorporates by reference and realleges as if set forth in full the allegations of ¶¶1-117.

119.    Pursuant to Rule 23.1 of the Federal Rules of Civil Procedures, plaintiff brings this action for the benefit of Lumber Liquidators to redress injuries suffered, and to be suffered, by Lumber Liquidators as a result of the defendants' breaches of fiduciary duty, corporate waste and unjust enrichment.   Lumber Liquidators is named as a nominal party in this action.

120.    Plaintiff is now, and has been at all times relevant to this action, a shareholder of Lumber Liquidators, and will adequately and fairly represent the interests of Lumber Liquidators in enforcing and prosecuting its rights.

121.    A pre-suit demand on the Lumber Liquidators Board to commence this action is excused as a useless and futile act for several reasons.  First, a pre-suit demand is excused because defendants ignored, consciously disregarded and/or were reckless in failing to establish and maintain internal controls and policies related to the Company's importation, manufacture, sale and distribution of Chinese flooring products necessary to ensure Lumber Liquidators' compliance with CARB Regulations, the Lacey Act, and other environmental and consumer protection rules and regulations.  Despite the fact that Lumber Liquidators imports nearly 50% of its products from Asia (with China – a country notorious for its black market for lumber – being by far Asia's largest exporter of timber), the Company maintains a representative office in Shanghai with "direct control" over its product sourcing in China, and the Company claims that it negotiates directly with the lumber mills to eliminate the middleman, is "environmentally conscientious," and "only purchases from suppliers who practice sustainable harvesting," on defendants' watch a long-standing scheme to violate environmental standards and laws occurred. This scheme could not have succeeded and endured had the Lumber Liquidators Board caused internal controls and policies to be adopted.  As a

result of the Lumber Liquidators Board Members' failure to act, when faced with a known duty to act, *i.e.*, to ensure Lumber Liquidators' compliance with the legal requirements applicable to formaldehyde emissions and timber sourcing of its products, the Lumber Liquidators Board Members breached their fiduciary duties of loyalty, candor and good faith owed to Lumber Liquidators. Accordingly, each member of the Lumber Liquidators Board faces a substantial likelihood of liability for breach of his fiduciary duties. Therefore, a pre-suit demand on the Lumber Liquidators Board is excused as futile.

122. Second, a presuit demand upon the Lumber Liquidators Board is excused because each of the Lumber Liquidators Board Members is personally interested in the outcome of this litigation, having caused Lumber Liquidators to issue false and misleading statements to the investing public in breach of their fiduciary duties of loyalty, candor and good faith. In particular, Lumber Liquidators' 2011, 2012, 2013 and 2014 Annual Reports on SEC Form 10-K were false and misleading when issued because they did not disclose that the Company was selling illegally sourced and toxic products to its customers. Consequently, each director defendant faces a substantial likelihood of liability and is interested in the outcome of this action.

123. Third, the Lumber Liquidators Board Members have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people with whom they have developed professional relationships, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

124.     A pre-suit demand is additionally excused as to defendant Lynch because he derives significant financial and/or personal benefits from his employment as the CEO and President of Lumber Liquidators.

125.     Audit Committee members Presley, Moore, Roper and Wade reviewed and approved the false and improper statements contained within the Company's reports filed with the SEC by virtue of their roles as members of the Board's Audit Committee.  As detailed above, the Charter provides that the members of the Audit Committee owe a heightened responsibility to Lumber Liquidators and its shareholders, including assisting the Board in its oversight of the Company's legal and regulatory compliance.  Thus, the Audit Committee members have demonstrated actions taken in bad faith that constitute breaches of their fiduciary duties, and as such, any demand upon them would have been futile.

## COUNT I

### Breach of Fiduciary Duty of Loyalty
### (and Candor and Good Faith)
### (All Defendants)

126.     Plaintiff incorporates by reference and realleges as if set forth in full the allegations of ¶¶1-125.

127.     Defendants owed Lumber Liquidators and its shareholders a fiduciary duty of loyalty (and candor and good faith).  Under this duty, defendants, when faced with a known duty to act, here Lumber Liquidators' legal duty to comply with state and federal laws and other environmental and consumer protection rules and regulations related to the importation, manufacture, sale and distribution of Chinese flooring, were duty bound to proactively implement internal controls and policies designed to ensure Lumber Liquidators' compliance with these laws.

128.     However, defendants failed to implement and maintain the aforementioned systems and controls.

129.    As a result of defendants' disloyalty, Lumber Liquidators has been injured and incurred damages in an amount to be determined at trial.  Accordingly, Lumber Liquidators is entitled to recover compensatory damages.  In addition, because the acts and omissions of the defendants were undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their civil obligations, Lumber Liquidators is entitled to recover punitive damages with respect to this Count.

## COUNT II

### Corporate Waste
### (All Defendants)

130.    Plaintiff incorporates by reference and realleges as if set forth in full the allegations of ¶¶1-129.

131.    As a result of the foregoing misconduct, defendants have caused Lumber Liquidators to waste valuable corporate assets.

132.    As a direct and proximate result of defendants' corporate waste, Lumber Liquidators has sustained and continues to sustain significant damages in an amount to be determined at trial.  As a result of the misconduct alleged herein, defendants are liable to the Company for compensatory damages in the amount of the corporate waste caused by defendants' wrongful acts and omissions. In addition, because the acts and omissions of the defendants were undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their civil obligations, Lumber Liquidators is entitled to recover punitive damages with respect to this Count.

## COUNT III

### Unjust Enrichment
### (All Defendants)

133.    Plaintiffs incorporate by reference and realleges as if set forth in full the allegations of ¶¶1-132.

134. By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to th-e detriment of Lumber Liquidators. Defendants were unjustly enriched as a result of the salaries, fees, stock options and other payments they received while breaching their fiduciary duty owed to Lumber Liquidators.

135. Plaintiff, as a shareholder of Lumber Liquidators, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other improper payments obtained by defendants, and each of them, from their wrongful conduct and fiduciary breaches.

136. As a result of defendants' unjust enrichment, Lumber Liquidators has been injured and is entitled to damages.

## COUNT IV

### Statutory Conspiracy
### (In Violation of Va. Code Ann. §§18.2-499 and 18.2-500)
### (All Defendants)

137. Plaintiff incorporates by reference and realleges as if set forth in full the allegations of ¶¶1-136.

138. By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken and concerted together for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

139. By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have attempted to procure the participation, cooperation, agreement or other assistance of other persons to enter into a combination, association, agreement, mutual understanding or concert for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

140.    The acts and omissions of the defendants complained of in this Count have been undertaken in order to serve the defendants' respective personal pecuniary interests, including without limitation the extensive profiteering from sales of Company stock owned by the defendants at artificially inflated prices, which interests are separate and distinct from, and indeed contrary to, the interests of the Company.

141.    The acts and omissions of the defendants complained of in this Count have been undertaken without justification.

142.    The acts and omissions of the defendants complained of in this Count have caused, are presently causing, and without intervention by this Court, will in the future continue to cause, irreparable harm to the Company and its shareholders, as described herein. Plaintiff and the Company's non-defendant shareholders have no adequate remedy at law to address the irreparable injury caused, being caused, and to be caused to them, including without limitation the grievous damage being done to the reputation of the Company and its ability to continue to conduct ordinary business operations.

143.    The Company has been injured as a direct and proximate result of the acts and omissions complained of herein, and has suffered damages in an amount to be determined at trial.

144.    Pursuant to Va. Code Ann. §18.2-500, plaintiff is entitled to entry of temporary and permanent injunctions restraining the defendants from continuing to take the acts and omissions described in this Complaint.

145.    Pursuant to Va. Code Ann. §18.2-500, plaintiff Lumber Liquidators is entitled to recover three times its actual damages incurred, plus reasonable attorneys' fees and costs herein expended.

## COUNT V

### Common-law Conspiracy
### (All Defendants)

146.    Plaintiff incorporates by reference and realleges as if set forth in full the allegations of ¶¶1-145.

147.    By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have combined, associated, agreed, conspired, mutually undertaken and concerted together for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

148.    By and through the wrongful acts and omissions described in this Complaint, the defendants, and each of them, have attempted to procure the participation, cooperation, agreement or other assistance of other persons to enter into a combination, association, agreement, mutual understanding or concert for the purpose of willfully and maliciously injuring Lumber Liquidators in its reputation, trade and business.

149.    The acts and omissions of the defendants complained of in this Count have been undertaken in order to serve the defendants' respective personal pecuniary interests, including without limitation the extensive profiteering from sales of Company stock owned by the defendants at artificially inflated prices, which interests are separate and distinct from, and indeed contrary to, the interests of the Company.

150.    The acts and omissions of the defendants complained of in this Count have been undertaken without justification.

151.    The Company has been injured as a direct and proximate result of the acts and omissions complained of herein, and has suffered damages in an amount to be determined at trial.

152.    The acts and omissions of the defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective

civil obligations, and accordingly Lumber Liquidators is entitled to recover punitive damages with respect to this Count.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment in the Company's favor and against all defendants, save and except nominal defendant Lumber Liquidators, as follows:

A.      Declaring that plaintiff may maintain this action on behalf of Lumber Liquidators and that plaintiff is an adequate representative of the Company;

B.      Declaring that the defendants have breached and/or aided and abetted the breaches of their fiduciary duties to Lumber Liquidators;

C.      Determining and awarding to Lumber Liquidators the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with prejudgment and postjudgment interest thereon;

D.      Awarding to Lumber Liquidators, jointly and severally from the defendants, three times the amount of actual damages incurred by the Company as a result of defendants' wrongful acts and omissions;

E.      Determining and awarding to Lumber Liquidators punitive and exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Requiring Lumber Liquidators to establish corporate policies and procedures prohibiting the use of Chinese manufacturers of its products;

G.      Prohibiting Lumber Liquidators from using wood or wood products from the RFE;

H.      Requiring Lumber Liquidators to establish corporate policies and procedures to ensure compliance with CARB standards for all Lumber Liquidators' flooring products;

I.     Ordering disgorgement and payment to Lumber Liquidators of all compensation and profits made by defendants, and each of them, at any time during which such defendant was breaching fiduciary duties owed to the Company and/or committing, or aiding or abetting the commitment of, corporate waste;

J.     Awarding plaintiff the costs and disbursements incurred in this action, including reasonable attorneys' and experts' fees, costs and expenses; and

K.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: April 15, 2015

AMALGAMATED BANK, As Trustee for THE
LONGVIEW 600 SMALL CAP INDEX FUND,
Derivatively on Behalf of LUMBER
LIQUIDATORS HOLDINGS, INC.

By: _____
Of counsel

ALAN D. ALBERT (VSB NO. 25142)
LeCLAIRRYAN, A Professional Corporation
999 Waterside Drive, Suite 2100
Norfolk, VA 23510
Telephone: 757/441-8914
Facsimile 757/624-3773
E-mail: alan.albert@leclairryan.com

THOMAS M. WOLF
LeCLAIRRYAN, A Professional Corporation
Riverfront Plaza, East Tower
951 East Byrd Street, Eighth Floor
Richmond, VA 23219
Telephone: 804/916-7143
Facsimile 804/916-7243
E-mail: thomas.wolf@leclairryan.com

Attorneys for Plaintiff

DARREN J. ROBBINS
BENNY C. GOODMAN III
ERIK W. LUEDEKE
ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
Facsimile 619/231-7423
darrenr@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

KATERINA POLYCHRONOPOULOS
ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
Facsimile 415/288-4534
katerinap@rgrdlaw.com

Attorneys for Plaintiff (motions for admission *pro hac vice* to be filed)

## VERIFICATION

I, Thomas B. O'Donnell, hereby declare as follows:

I am Senior Vice-President and Head of Equities at Amalgamated Bank. Plaintiff Amalgamated Bank, as Trustee for the LongView 600 Small Cap Index Fund, currently holds Lumber Liquidators Holdings, Inc. common stock, was a shareholder at the time of the wrongdoing complained of and has continuously remained a shareholder since 2009.

Plaintiff has retained competent counsel and is ready, willing and able to pursue this action vigorously on behalf of Lumber Liquidators. Plaintiff, or its representative, has read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty of Loyalty, Corporate Waste and Unjust Enrichment (the "Complaint"). The facts set forth in the Complaint that relate to plaintiff's acts and deeds are true to my own knowledge. The other facts set forth in the Complaint are true and correct to the best of plaintiff's knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Date: _April 14, 2015_

AMALGAMATED BANK, as Trustee for the
LongView 600 Small Cap Index Fund

By: _Thomas B. O'Donnell_

Thomas B. O'Donnell

I:\Admin\CptDraft\Derivative\CPT Lumber Liquidators-VERIFICATION.docx